UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
JUN 1 8 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

SEAN MCTERRELL,

        Plaintiff,

    v.

C. KOENIGSMANN, et al.,

        Defendants.

**DECISION AND ORDER**

1:18-CV-01028 EAW

## <u>INTRODUCTION</u>

*Pro se* plaintiff, Sean McTerrell ("Plaintiff"), an inmate incarcerated at the Attica Correctional Facility, filed this action seeking relief under 42 U.S.C. § 1983. (Dkt. 1). Plaintiff has also requested permission to proceed *in forma pauperis*. (Dkt. 7). Since filing the instant action, Plaintiff has repeatedly moved to amend or correct his Complaint to add Defendants and claims. (Dkt. 8; Dkt. 10; Dkt. 13; Dkt. 15; Dkt. 16; Dkt. 18; Dkt. 20; Dkt. 22; Dkt. 23). Plaintiff has additionally requested assignment of counsel (Dkt. 17; Dkt. 21), a temporary restraining order, and a preliminary injunction (Dkt. 1 at 4; Dkt. 8 at 2; Dkt. 15; Dkt. 17).

Plaintiff alleges that while he was confined at the Southport Correctional Facility ("Southport"), Attica Correctional Facility ("Attica"), Elmira Correctional Facility ("Elmira"), and Auburn Correctional Facility ("Auburn"), Defendants violated his equal protection rights, Eighth Amendment rights, and rights pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

- 1 -

The Court has reviewed Plaintiff's motion for *in forma pauperis* status, and it is granted. The Court has also reviewed the complaint as required by 28 U.S.C. § 1915(e)(2), and finds the following claims are sufficient to proceed to service: (1) denial of medication in violation of Plaintiff's Eighth Amendment rights by Southport Nurse Jane Doe, Nurse Bonner, and Attica Doctors John and Jane Does; (2) denial of treatment for kidney failure in violation of Plaintiff's Eighth Amendment rights by Attica Doctors John and Jane Does; (3) denial of mental health treatment following attempted suicide in violation of Plaintiff's Eighth Amendment rights by Long and Forster; (4) violation of right to privacy by Nurse Sault and Nurse Yates; (5) excessive use of force by Roberts and Forster; (6) excessive use of force by Scyrous/Skoczylas[1]; (7) failure to protect by Dr. Galite; (7) unlawful conditions of confinement by Nurse Kasal; (8) unlawful conditions of confinement by Attica Corrections Officers John and Jane Does; and (9) retaliation by Nurse Sault.

## BACKGROUND

The following facts are taken from Plaintiff's Complaint and supplemental filings,[2] and are presumed true at this stage of the proceedings.

---

[1] Plaintiff states in his May 30, 2019 affidavit that the correct spelling is Skoczylas. (Dkt. 24 at 1).

[2] Plaintiff's Complaint is ten pages of sparse and often confusing factual allegations, supplemented by more than 180 pages of grievances and medical records. Plaintiff "has attached many exhibits and attachments . . . apparently in the mistaken belief that exhibits may be a substitute for factual allegations in the complaint." *Moran v. Lebowitz*, No. 10-CV-6178CJS, 2013 WL 1337267, at *4 (W.D.N.Y. Mar. 27, 2013*), report and recommendation adopted*, 2013 WL 1855798 (W.D.N.Y. Apr. 30, 2013). However, "[a]ttaching documents without providing the facts to support his claims is not sufficient." *Antrobus v. City of N. Y., Dep't of Sanitation*, 11 CV 5434 CBA LB, 2012 WL 6675387, at *3 (E.D.N.Y. Aug. 15, 2012), *report and recommendation adopted*, 11-CV-5434 CBA

Between June 28, 2017, and April 13, 2018, Plaintiff was housed at Auburn. (Dkt. 1 at 4). From June 28, 2017, until January 19, 2018, Plaintiff did not take his AIDS medication because he was afraid of adverse reactions. (*Id.* at 3). On July 7, 2017, Plaintiff was taken to Syracuse Hospital. (*Id.*). After 59 days of refusing medication, he went into toxic shock "that destroyed [his immune] system beyond repair." (*Id.*).

On January 16, 2018, Plaintiff had an appointment with Dr. Dinello to discuss his HIV medication. (*Id.* at 4; Dkt. 13 at 1). Plaintiff had previously been cleared by pharmacist D. Sanders to use Rayetez, Noriver, and Travada, but Plaintiff did not take them because their labels indicated that they could have an adverse reaction with other drugs he was already prescribed. (Dkt. 13 at 1). Plaintiff asked Dr. Dinello to be tested for gene variation HLA-B*5701[3] to find out if he would have an adverse reaction to a different medication, Epzicom. (Dkt. 1 at 4; Dkt. 13 at 1). Dr. Dinello told Plaintiff he would order the test, and had his blood drawn. (Dkt. 13 at 2). However, Dr. Dinello never ordered the

---

LB, 2012 WL 6675168 (E.D.N.Y. Dec. 20, 2012). Additionally, since filing the Complaint, Plaintiff has submitted 14 additional filings, including multiple motions to amend the Complaint. (*See* Dkt. 8; Dkt. 10; Dkt. 12; Dkt. 13; Dkt. 14; Dkt. 15; Dkt. 16; Dkt. 17; Dkt. 18; Dkt. 20; Dkt. 21; Dkt. 22; Dkt 23; Dkt. 24). Federal Rule of Civil Procedure 15 provides that "[a] party may amend its pleading once as a matter of course within [ ] 21 days after serving it. . . . In all other cases, a party may amend its pleading only with . . . the court's leave. The court should freely give leave when justice so requires." Given Plaintiff's *pro se* status, the Court considers his supplemental filings in this Screening Order.

[3] The National Institute of Health has advised that the risk of an allergic reaction to Epzicom is higher for people with a gene variation called HLA-B*5701. Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV, AIDSinfo, Nat'l Institute of Health (Jan. 10, 2011), https://aidsinfo.nih.gov/guidelines/html/1/adult-and-adolescent-arv/7/hla-b--5701-screening.

test and instead ordered that Plaintiff be prescribed Epzicom. (Dkt. 1 at 4). Plaintiff refused to start taking the Epzicom, and he alleges he was sent to the SHU as a result. (Dkt. 13 at 2). Plaintiff lost half of his t-cells, had extreme stomach pain and bowel troubles for six weeks, lost weight, and developed Graves' Disease, a rash, "neuropathy," and suicidal thoughts. (Dkt. 1 at 4).

At some point when Plaintiff was housed at Auburn, the facility was on lockdown for six-and-a-half days, during which time Plaintiff did not wash himself or have a hot meal. (*Id.* at 3).

Plaintiff was transferred to Southport on or about April 13, 2018. (*Id.*). After he arrived, the doctor would not change his HIV medication, telling him he did not stay on the previous medication long enough. (*Id.*). Additionally, Nurse Administrator Von Higgens would not order the HIV medication Plaintiff wanted. (Dkt. 13 at 2). Some of Plaintiff's medications were discontinued by Dr. Gonzalez and Nurse Watkins ("Watkins") "for no reason": Geadon, Claratin, Glucerna, "eye drops," and Nasacort. (Dkt. 1 at 4). One of the nurses[4] also did not give Plaintiff his medication for four days. (*Id.*).

On May 8, 2018, Plaintiff was housed at Elmira. (*Id.* at 4, 73). A corrections officer sprayed another inmate with mace, and Plaintiff could not breathe. (*Id.* at 4). The officer refused to open a window or get a nurse to bring Plaintiff his asthma pump. (*Id.*).

Plaintiff arrived at Attica on June 13, 2018, where he was denied use of the law library to write a supplemental brief. (Dkt. 13 at 2). He also alleges that Corrections

---

[4]    Plaintiff did provide a name, but it is illegible. (Dkt. 1 at 4).

Officer Leanton "was racist in the E.R." because he called Plaintiff a dumb monkey, a comment Plaintiff responded to by grabbing a chair and ramming the door until someone came. (*Id.*).

While at Attica, Plaintiff refused to take Presistatin starting on July 13, 2018, a medicine Doctor Moorjay had prescribed "because [Plaintiff] was having trouble swallowing." (*Id.*). At an unknown time, the prescription was changed to Presista 800mg, which Plaintiff "started [] without knowing any of the drug contras." His problems with swallowing were caused by a throat infection, and while the infection was treated with Diflucan, Plaintiff lost 17 pounds because he could not swallow. (*Id.*). Plaintiff was denied weight-gain medication by Doctors William, Graf, and Lakowski. (*Id.*).

On July 24, 2018, Plaintiff alleges he began to hear voices and attempted suicide. (*Id.*). He further alleges that "Dr. John Doe would not give me anything for the voices." (*Id.*). The same day, Plaintiff refused to enter his SHU cell because "the devil was in that cell." (*Id.* at 3). Sergeant Rafferty called Forster from the mental health unit, who came and told him to go in his cell. (*Id.*). Sergeant Long said he would write Plaintiff up unless he went in the cell, so Plaintiff went in and tried to hang himself. (*Id.*). Corrections Officers Roberts and Forster "rip[p]ed the rope from [Plaintiff's] neck, knock[ed] [him] to the floor, punched [him] in [the] ribs 4 times," forced a knee to the back of his head, and kicked him in the groin before placing him in handcuffs. (*Id.*). Plaintiff was then slammed onto a gurney where he had a seizure. (*Id.*). Doctors Graf and William took x-rays of his neck but did not allow him a remote video medical consultation, give him medication, or

otherwise treat his injuries. (*Id.*). Plaintiff was transported back to the mental health unit on the gurney in his underwear with his genitals exposed. (*Id.*).

In August of 2018, Plaintiff was given an overdose of medication which caused him severe pain. (*Id.*).

On or about October 26, 2018, another inmate found Plaintiff's glasses in the shower. (Dkt. 12 at 6). A sergeant searched the inmate's cell and found pieces of broken glasses and the frames, which were given to Plaintiff. (*Id.*). At Sergeant Baker's request, Plaintiff gave the broken pieces to Sergeant Baker. (*Id.*). Plaintiff was then told by the eye doctor that he would have to pay to replace the glasses on his own. (*Id.*).

On November 1, 2018, Plaintiff was diagnosed with kidney failure/renal insufficiency at W.C.C.H.,[5] told to start a non-fat renal diet, and taken off his pain medications. (Dkt. 8 at 1; Dkt. 13 at 2). Plaintiff was also forced to stop taking AIDS medication because of the adverse effects, including liver and kidney failure. (Dkt. 8 at 2). Plaintiff alleges "I am in extreme pain and death is upon me," and that mental health doctors "have stopped my meds because of this." (*Id.*).

On December 21, 2018, Plaintiff went to the emergency room at Attica for chest pains, where "Dr. Williams would not even give me one aspirin and sent me back to the SHU." (*Id.*). On January 7, 2019, Doctor Moorjay spoke with Plaintiff via videoconference and called Plaintiff "shitty." (Dkt. 12 at 7). Plaintiff also alleges that Nurse Casaic "stabbed me with an insulin needle," giving him nightmares. (*Id.*).

---

[5]    This may refer to the Wyoming County Community Health System facility some thirteen miles from Attica.

On January 13, 2019, Plaintiff was again taken to a medical center for chest pains. (Dkt. 13 at 3). Plaintiff adds that he has never been given an ace inhibitor or other blood pressure medication, and that he has been refused Pepcid, Pepto Bismol, Maalox, and ex-lax, which he believes will help him "tolerate my cocktail." (*Id.*). Also on this day, Doctor Graf denied him a "renal diet" which was recommended at the W.C.C.H. in November. (*Id.*). On March 1, 2019, "MD William came and he did not hook me up to a heart monitor or order anything for my heart but Tylenol and discharge me out of retaliation." (Dkt. 18 at 1).

Plaintiff alleges that he had an appointment with Dr. Galite on March 11, 2019, where he told the doctor that his kidneys were better, that he wanted self-carry for his medication, that the nurses were not bringing him his HIV medications, and that the doctor should recommend Hepatitis C treatments for him. (Dkt. 23 at 2). Dr. Galite did not do anything after this meeting. (*Id.*). Additionally, on March 18, 2019, Plaintiff claims he was misdiagnosed by social worker Jacklen Gorski. (*Id.*).

On another occasion, Plaintiff asked Dr. Graf and Dr. Williams for medical boots and medicine to treat his feet for neuropathy caused by Type 2 diabetes and AIDS. (Dkt. 18 at 1). They said they would order them and never did, and they also have not monitored his kidney and liver function. (*Id.*).

Plaintiff alleges Ms. Fuller and Superintendent Noeth did not allow him to pursue administrative remedies for his grievances. (Dkt. 12 at 4). Additionally, Plaintiff alleges that since he filed the Complaint, Nurse Sault has written him up three times. (Dkt. 8 at 1).

Further, Plaintiff alleges Nurses Sault and Yates did not keep his information confidential, causing other guards and inmates to threaten to sexually assault, beat, and kill him. (Dkt. 12 at 4). Nurse Sault also allegedly refused to respond to Plaintiff's sick call, and Plaintiff told Nurse Sault that he would file a grievance against her for not helping him. (*Id.*). She replied, "now I'm going to write you up." (*Id.*). Although he was found not guilty of threatening Nurse Sault, on October 31, 2018, he was disciplined for being argumentative and screaming. (*Id.* at 4, 16).

Plaintiff also alleges that when Corrections Officer James was escorting him to get an insulin shot, he failed to protect him when an inmate reached out of the shower and cut him with a nail clipper. (Dkt. 13 at 4). He told Nurse Sault about the cut two days later and asked for a tetanus shot, but she just laughed and asked the other inmate if he cut Plaintiff. (*Id.*).

Additionally, Plaintiff alleges he now wears diapers, but that Nurse Kasal does not bring him new ones when she comes to check on him. As a result, Plaintiff has soiled his bed, and although he has requested a new mattress, he has not received one. (*Id.*). Plaintiff also alleges that he "was placed in a cell with feces on the walls, sink, floor and no cleaning supplies," that Corrections Officer Scyrous/Skoczylas urinated in his coffee twice, that Plaintiff found hairs in his food, and that he was bitten by flies. (*Id.*). He further accuses Lynda Battaglia and mental health unit workers Hae and Forster of using his diagnosis of anti-social personality disorder to keep him in the special housing unit ("SHU"). (*Id.*).

Plaintiff "was told by Nurse Keaffus that 'the doctors plan to stall you out.'" (Dkt. 16 at 2). He faults Cord Stone, Western District Regional Medical Director, for "not giving

me timely treatment and for not transferring me to a regional medical facility," and for not providing him with a second opinion for the Hepatitis C treatment, because Plaintiff wrote to him four times with no response. (Dkt 18; Dkt. 20). He also alleges that Commissioner Annucci created a policy in 1994 with Governor Cuomo to not treat inmates with Hepatitis C. (Dkt. 24 at 1). Further, he alleges Doctor Etractor stopped his psych medication three times and would not replace it. (Dkt. 23 at 2).

He alleges the B-18 area supervisor made him walk to the medical unit with a limp left leg after he had "a near stroke," or else Plaintiff's evening medication, including insulin, would have been denied for 40 days. (Dkt. 18 at 1). Plaintiff further alleges that he was denied the ability to self-carry his medications for nine months, and that Nurse Bonner denied him his HIV medications three times. (*Id.*). Finally, Plaintiff claims he is being denied a notary, legal supplies, and a typewriter because he is on long-term keeplock. (*Id.* at 2).

Plaintiff filed the instant action on September 18, 2018 (Dkt. 1), along with a motion for leave to proceed *in forma pauperis* (Dkt. 2). The Court denied Plaintiff's motion without prejudice on November 9, 2018. (Dkt. 5). Plaintiff refiled the motion to proceed *in forma pauperis* on November 29, 2018 (Dkt. 7), along with a motion to amend (Dkt. 8).

On December 20, 2018, Plaintiff filed a second motion to amend. (Dkt. 10). On February 11, 2019, Plaintiff filed another motion to amend with an amended verified complaint attached. (Dkt. 12). On February 14, 2019, Plaintiff filed a fourth motion to amend the Complaint and a request for a temporary restraining order. (Dkt. 13). On February 28, 2019, Plaintiff filed a Motion to Add a Party (Dkt. 15), and a request for a

hearing "for the medical damages and costs for treatment" (Dkt. 16). On March 13, 2019, Plaintiff filed a motion for a temporary restraining order and preliminary injunction (Dkt. 17), and a motion to add defendants and claims (Dkt. 18). On April 8, 2019, Plaintiff filed another motion to amend (Dkt. 20), and an additional motion to appoint counsel (Dkt. 21). On April 22, 2019, Plaintiff filed a motion to add additional defendants that consists of a single page with attachments and contains no factual allegations against any Defendant. (Dkt. 22). On May 1, 2019, Plaintiff filed a ninth motion to amend (Dkt. 23), with a supporting affidavit filed on May 30, 2019 (Dkt. 24).

Plaintiff claims that Defendants are guilty of deliberate indifference and violated his right to equal protection of the law and under the ADA. He requests $7,000,000.00 in damages, court appointed counsel, and a temporary restraining order and a preliminary injunction giving him various medical treatments and devices.

## DISCUSSION

Because Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed the required authorization (Dkt. 2), he is granted permission to proceed *in forma pauperis*. Therefore, under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a), the Court must screen the Complaint. The Court now faces the difficult task of conducting initial review of fourteen filings comprising over 360 pages. Plaintiff's allegations are often unclear as to the time and place of events, and frequently move in an apparent stream of consciousness style between events in different years and different prisons, although it is clear that Plaintiff faces numerous serious medical difficulties and wishes to actively participate in his care.

## I.    Legal Standard

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the court determines that the action (1) fails to state a claim upon which relief may be granted or (2) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)-(2). Generally, the court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639 (quotation omitted). But leave to amend pleadings may be denied when any amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

In evaluating the Complaint, the Court must accept all factual allegations as true and must draw all inferences in Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). "Specific facts are not necessary," and a plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) (discussing pleading standard in *pro se* cases after *Twombly*: "[E]ven after *Twombly*, dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Although "a court is obliged to

construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004).

## II.    Section 1983 Claims

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

### A.    Denial of Medical Care Claims

A claim for denial of medical care rises to the level of a constitutional violation only where the facts alleged show that a defendant was deliberately indifferent to a plaintiff's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 87, 104-05 (1976); *Ross v. Kelly*, 784 F. Supp. 35, 43-44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (unpublished table decision). This standard has both an objective and subjective component. Plaintiff's medical needs must be objectively serious. "A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Harrison v. Barkley*, 219 F.3d 132, 136-37

(2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted)).

For his claim to survive this initial review, Plaintiff must also address the subjective component—that the prison officials were deliberately indifferent to this need. "Not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) ("The prisoner's right is to medical care—not the type or scope of medical care which he personally desires. A difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983." (quotation omitted)); *accord Ross*, 784 F. Supp. at 43-44.

## 1. Types of HIV/AIDS Medication

Plaintiff alleges he was denied gene variation HLA-B*5701 testing and refused to take a certain medication until that test was carried out. (Dkt. 1 at 4). He attributes an episode of toxic shock to this denial. (*Id.*). He also alleges that he was prescribed drugs he believed would have adverse reactions with others he was taking, and consequently that he would not take them. (*Id.* at 3; Dkt. 13 at 1). He further alleges that Nurse Administrator Von Higgens and Dr. Galite would not order self-carry with regard to certain HIV medications (Dkt. 13 at 2; Dkt. 23 at 2), and that he was denied the HIV medications he

requested as well as Pepto Bismol and other over-the-counter medications he believes would help him tolerate his HIV medication cocktail (Dkt. 13 at 3).

It cannot be inferred from Plaintiff's allegations that Defendants were deliberately indifferent. Plaintiff alleges that he disagreed with his doctors about which medicines he should take and when, and which medical tests should be conducted. These allegations do not, without more, state a constitutional violation. The same is true for Plaintiff's allegations regarding drug contraindications. Plaintiff alleges that he spoke with multiple doctors about possible drug contraindications, but he also alleges that a pharmacist looked at his medications and cleared him to take them. (Dkt. 13 at 1). Such situations do not call for inmates to choose which medications to continue, but rather for the application of the medical staff's skill and knowledge. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").

Even if Plaintiff did experience a contraindication,[6] it would still not rise to the level of a constitutional violation. "[A] claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983." (quoting *Hannah v. Chouhan*, No. 3:04CV314 (JBA), 2005 WL 2042074, at *3 (D. Conn. Aug. 24, 2005)); *see Burgess v. County of Rensselaer*, No. 1:03-CV-00652 (NPM-RFT), 2006 WL 3729750, at *8 (N.D.N.Y. Dec. 18, 2006); *see also Jones v. Tompkins*, 12-CV-57, 2016 WL 4211610, at *7 (W.D.N.Y. Aug. 10, 2016), *aff'd*, 715 F. App'x 101 (2d Cir.

---

[6] Plaintiff alleges that after he began taking a new medication, the course of treatment was quickly stopped because it caused his kidneys and liver to fail (Dkt. 8 at 2), although it is not clear from Plaintiff's allegations whether the failure was due to a contraindication or a different adverse reaction.

2018) (noting that an unsuccessful course of treatment does not support a finding of deliberate indifference and that the "Eighth Amendment does not require medical success").

Plaintiff has failed to allege facts from which the Court can infer that the choice of medicine for HIV treatment rises to the level of deliberate indifference, and not mere disagreement with his course of treatment. Accordingly, the Court dismisses these claims.

### 2. Denial of Medication

Plaintiff alleges that his Hepatitis C is not being treated and that the Attica doctors have told him he does not qualify for Hepatitis C treatment because he is "non compliant" about taking his medication. (Dkt. 13 at 4). "[R]efusal to administer [Hepatitis C] medication shows sufficient personal involvement and deliberate indifference to give rise to § 1983 liability." *Chambers v. Wright*, No. 05 Civ. 9915(WHP), 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007); *see Carbonell v. Goord*, No. 99 Civ. 3208(AJP), 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000). Additionally, Plaintiff alleges that he was denied HIV medications three times by Nurse Bonner (Dkt. 18 at 1), and for four days by a Southport nurse (Dkt. 1 at 4). The Court finds these allegations are sufficient at this stage of the proceedings for these claims to proceed.

Plaintiff also alleges that Commissioner Annucci and Governor Cuomo created a policy in 1994 to not treat inmates like himself who have Hepatitis C. (Dkt. 24 at 1). However, Plaintiff does not "allege facts showing that similar alleged deprivations occurred as to other inmates." *Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *5 (S.D.N.Y. Mar. 27, 2019); *see Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10,

14 (2d Cir. 2015) (affirming dismissal of *Monell* claim and noting that "other than the plaintiff, the amended complaint provides only one additional example of a similar incident"). Accordingly, his conclusory statement does not support a plausible claim against Commissioner Annucci or Governor Cuomo.[7] *See Jouvert v. New York*, No. 10-CV-930 (MAD/CFH), 2012 WL 6964386, at *6 (N.D.N.Y. Oct. 23, 2012) (holding plaintiff's allegation that Cuomo "approved and encouraged other named defendants to draft, distribute, and enforce the . . . merit-less directive concerning inmates' use of dreadlocks in their hair" was a conclusory statement that does not support a plausible claim (original alterations and quotation omitted)), *adopted*, 2013 WL 372331 (N.D.N.Y. Jan. 29, 2013).

Plaintiff further alleges that he was threatened by the area supervisor of the SHU with denial of his evening medications and Insulin for 40 days unless he walked to the medical unit with a "limp left leg." Plaintiff fails to allege any injury as a result. "Courts in the Second Circuit have consistently held that '[m]ere threats, verbal harassment or profanity, without any injury or damage, are not actionable under Section 1983.'" *Justice v. McGovern*, No. 11-CV-5076 (JS)(WDW), 2012 WL 2155275, at *3 (E.D.N.Y. June 12, 2012) (collecting cases). Accordingly, this claim is dismissed.

---

[7] Plaintiff also attempts to assert a claim against "O.M.H. Unit Chief Ms. Batigia for allowing bad mental health treatment and policies and discrimination." (Dkt. 24 at 1). The Court finds such a conclusory claim may not proceed to service.

### 3. Kidney Failure

Plaintiff alleges that he was denied a renal diet by Dr. Graf, despite one being recommended for him by W.C.C.H., and that he was in kidney failure for four-and-a-half months and denied any treatment for his condition.

Plaintiff's allegations regarding the renal diet are insufficient to state a claim. "While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, no claim is stated when a doctor disagrees with the professional judgment of another doctor." *Ravenell v. Van der Steeg*, No. 05 CIV 4042 WHP, 2007 WL 765716, at *6 (S.D.N.Y. Mar. 14, 2007) (collecting cases). Plaintiff's claims about being denied a renal diet only allege a disagreement between doctors, not deliberate indifference. However, his allegations about being denied any treatment for kidney failure for four-and-a-half months are sufficient because, making every rational inference in Plaintiff's favor, that denial was made without any medical justification. Therefore, the claim that Plaintiff was denied treatment for kidney failure for four-and-a-half months may proceed to service against Attica Doctors John and Jane Does.

### 4. Blood Pressure and Chest Pains

Plaintiff faults his doctors generally for not providing blood pressure medication despite incidents of elevated blood pressure and chest pains. (*See, e.g.*, Dkt. 8 at 2). Plaintiff has failed to allege any facts that indicate the decision to not give him blood pressure medication was done out of deliberate indifference instead of disagreement over the proper course of his treatment. Accordingly, the Court dismisses this claim.

### 5. Throat Infection

While at Attica, Plaintiff refused to take Presistatin starting on July 13, 2018, a medicine Doctor Moorjay had prescribed "because [Plaintiff] was having trouble swallowing." (Dkt. 13 at 2). At an unknown time, the prescription was changed to Presista 800mg, which Plaintiff "started [] without knowing any of the drug contras." His problems with swallowing were caused by a throat infection, and while the infection was treated with Diflucan, Plaintiff lost 17 pounds because he could not swallow. (*Id.*). Plaintiff was denied weight-gain medication by Doctors William, Graf, and Lakowski. (*Id.*).

As previously discussed, mere disagreements over a course of treatment are not sufficient to state a denial of medical care claim. Additionally, "[a]llegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment." *Harris v. Westchester Cty. Med. Ctr.*, No. 08 Civ. 1128(RJH), 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) (alteration in original) (quoting *Anderson v. Lapolt*, No. 9:07-CV-1184, 2009 WL 3232418, at *13 (N.D.N.Y. Oct. 1, 2009)). Accordingly, Plaintiff's claims regarding his throat infection and subsequent weight loss are dismissed.

### 6. Mental Health Treatment

Plaintiff faults "OMH Gonzalez" for stopping his mental health medication "cold turkey," however, Plaintiff also makes it clear that the discontinuation of the medication was a consequence of Plaintiff's refusal to see his mental health provider. (Dkt. 13 at 2). He also alleges that Doctor Etractor stopped his psych medication three times and would not replace it (Dkt. 23 at 2), and that Doctor John Doe "would not give me anything" when Plaintiff complained of hearing voices (Dkt. 13 at 2). Plaintiff's sparse allegations indicate

nothing more than a disagreement with treatment decisions made by the doctors. As Plaintiff has failed to allege any facts from which deliberate indifference by Defendants can be inferred, this claim is dismissed.

### 7.    Treatment Following Attempted Suicide

Plaintiff alleges that in the immediate aftermath of a suicide attempt, he refused to enter his cell because "the devil was in that cell," but Sergeant Long and Forster forced him to go in. (Dkt. 13 at 3). After Plaintiff did so, he again tried to commit suicide by hanging himself. (*Id.*). "Non-medical personnel may engage in deliberate indifference if they intentionally deny or delay access to medical care for suicidal inmates." *Jean v. Barber*, 9:09-CV-430 MAD/GHL, 2011 WL 2975218, at *5 (N.D.N.Y. July 21, 2011). "[T]here are circumstances where an inmate's pending threat or attempt at suicide in the moment provides sufficient notice to non-medical prison personnel of serious mental health needs." *Young v. Choinski*, 15 F. Supp. 3d 194, 202 (D. Conn. 2014). The Court finds these allegations are sufficient for Plaintiff's claim against Long and Forster to proceed to service.

Following Plaintiff's attempted suicide on July 24, 2018, Doctors Graf and William ordered x-rays of Plaintiff's neck, but "did not give me treatment for injuries or seizure." (Dkt. 13). "[D]isagreements over medications, diagnostic techniques (*e.g.*, the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Plaintiff's claim against Doctors Graf and William is accordingly dismissed.

### 8.    Eye Glasses

Plaintiff also alleges he was told that he would have to pay to replace bifocals broken by another inmate. (Dkt. 12 at 6). The Second Circuit has held that depriving an inmate of glasses will rise to the level of a constitutional violation when the resulting "visual deficiencies can readily cause a person to fall or walk into objects." *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996); *see Johns v. Goord*, No. 9:09-CV-1016, 2010 WL 3907826, at *3-4 (N.D.N.Y. Sept. 30, 2010) (collecting cases). As Plaintiff has failed to allege sightlessness or that his eyes have deteriorated because of the loss of his glasses, the Court dismisses this claim.

### 9.    Nail Clipper

Plaintiff also alleges that when he told Nurse Sault about another inmate cutting him with a nail clipper, she laughed and asked the other inmate if he cut Plaintiff. (Dkt. 13 at 4). This claim fails to allege that Plaintiff's cut was a serious medical need. *See, e.g.*, *Dawes v. Coughlin*, 159 F.3d 1346, at *1 (2d Cir. June 12, 1998) (unpublished table decision) (holding the plaintiff's injury, a one-and-a-half-inch laceration on his elbow, was not sufficiently serious to give rise to an Eighth Amendment claim); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (dismissing a deliberate indifference to medical needs claim where the plaintiff's injury was a cut finger). The Court accordingly dismisses this claim.

### 10.    Use of a Catheter

Plaintiff alleges that a catheter was used on him against his will when he was taken to Belleville in an ambulance. (Dkt. 1 at 8). Plaintiff names no defendants and gives no

timeframe for when this incident occurred. It is unclear whether Plaintiff was incarcerated at the time—he alleges that part of his harm was loss of employment at a rate of $18 per hour. (*Id.*). Plaintiff's claims are insufficient to state a claim under § 1983, which requires that the defendants acted under color of state law. *Whalen*, 126 F.3d at 405.

To the extent that Plaintiff's claim can be construed as a violation of state tort law, it is also dismissed as it is impossible to infer when or where the alleged incident took place or who was involved, let alone give any potential defendants fair notice. *See Twombly*, 550 U.S. at 545 ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," (alteration in original) (quotations omitted)). Additionally, the Court cannot ascertain from Plaintiff's allegations whether it has jurisdiction over such a claim. Accordingly, this claim is dismissed.

### 11. Other Medical Complaints

Plaintiff alleges several other medical claims: that he was given an overdose of medication which caused him severe pain (Dkt. 13 at 2), that Nurse Casaic "stabbed me with an insulin needle" (Dkt. 12 at 7), and that he was misdiagnosed by social worker Jacklen Gorski (Dkt. 23 at 2). "[A] claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983," *Burgess v. County of Rensselaer*, No. 1:03-CV-00652 (NPM-RFT), 2006 WL 3729750, at *8 (N.D.N.Y. Dec. 18, 2006) (quoting *Hannah v. Chouhan*, No. 3:04CV314 (JBA), 2005 WL 2042074, at *3 (D. Conn. Aug. 24, 2005)). The Court therefore dismisses these claims.

Additionally, Plaintiff's claim that Doctor Moorjay called Plaintiff "shitty" (Dkt. 12 at 7), is not sufficient to state a constitutional claim, *see Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called [the plaintiff] names also did not allege any appreciable injury and was properly dismissed."). This claim is accordingly dismissed.

## B.     Right to Privacy

Plaintiff alleges Nurses Sault and Yates did not keep his health information confidential, causing other guards and inmates to threaten to sexually assault, beat, and kill him. (Dkt. 12 at 4). "[T]here exists in the United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters.'" *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977)). The Second Circuit has held, "the gratuitous disclosure of an inmate's confidential medical information as humor or gossip . . . violates the inmate's constitutional right to privacy." *Powell v. Schriver*, 175 F.3d 107, 112. Making every rational inference in Plaintiff's favor, the Court finds this claim is sufficient at this stage of the litigation, and accordingly may proceed to service.

## C.     Excessive Use of Force

On July 24, 2018, Plaintiff alleges he refused to enter his SHU cell because "the devil was in that cell." (Dkt. 13 at 3). When Long and Forster forced Plaintiff to go in, he tried to hang himself. (*Id.*). Corrections Officers Roberts and Forster ripped the rope from his neck, knocked him to the floor, punched him in the ribs four times, forced a knee on the back of Plaintiff's head, and kicked him in the groin before placing him in handcuffs.

(*Id.*). Plaintiff was then slammed onto a gurney where he had a seizure. (*Id.*). After being examined by doctors, Plaintiff was transported back to the mental health unit on the gurney in his underwear with his genitals exposed. (*Id.*).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). For an excessive use of force claim, a plaintiff must allege each of the following two elements: (1) the defendant used force against the plaintiff maliciously and sadistically, for the very purpose of causing the plaintiff harm, and (2) the plaintiff suffered some harm as a result of the defendant's use of force. *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992).

The first element is considered a subjective analysis of the defendant's state of mind at the time of the incident. This requires an allegation that the defendant had "'the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Goord*, 554 F.3d at 268 (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). Whether a use of force against a prison inmate is unnecessary or wanton depends on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson*, 503 U.S. at 7).

Some factors courts consider when determining whether prison officials unnecessarily and wantonly inflicted pain on an inmate include: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and

the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). If the plaintiff alleges facts that, if true, demonstrate the defendants acted sadistically or with malice, then an excessive use of force claim has been properly stated. *Green v. McLaughlin*, 480 F. App'x 44, 49 (2d Cir. 2012).

The second element of a claim of cruel and unusual punishment is objective and "focuses on the harm done, in light of 'contemporary standards of decency.'" *Goord*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8). "Nonetheless, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to '*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" *Id.* at 269 (quoting *Hudson*, 503 U.S. at 8).

Plaintiff has adequately alleged an excessive use of force claim at this stage of the proceedings. Making all reasonable inferences in Plaintiff's favor, he has alleged that at least some of the force used against him, such as the kicking and punching, was unnecessary and/or wanton, and that he suffered a seizure as a consequence.

Plaintiff additionally alleges that that Corrections Officer Scyrous/Skoczylas urinated in his coffee twice. (Dkt. 13 at 4; Dkt. 24 at 1). The Court finds that this allegation is also sufficient to proceed to service at this time. *See Hogan v. Fischer*, 738 F.3d 509, 516 (2d Cir. 2013) (holding that spraying an inmate with vinegar, excrement, and machine oil is more than a *de minimis* use of force and rises to the level of an Eighth Amendment violation).

Therefore, Plaintiff's excessive use of force claims may proceed to service.

## D.     Failure to Protect

Plaintiff alleges that when Corrections Officer James was escorting him to get an insulin shot, he failed to protect him when an inmate reached out of the shower and cut him with a nail clipper. (Dkt. 13 at 4). He also alleges that Dr. Galite failed to do anything after Plaintiff told him that the nurses were not bringing his HIV medication. (Dkt. 23 at 2).

"The Eighth Amendment requires that prison officials take 'reasonable measure to guarantee the safety of inmates in their custody.'" *Blake*, 2014 WL 4230889, at *4 (quoting *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996)). "Accordingly, a prison official's failure to protect a prisoner from harm may form the basis of a § 1983 claim." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

"To state a failure-to-protect claim under § 1983, the plaintiff must establish two conditions: 'First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed [the] sufficient culpable intent' of deliberate indifference." *Randolph v. Griffin*, No. 12-CV-745S, 2014 WL 3548967, at *6 (W.D.N.Y. July 17, 2014) (quoting *Hayes*, 84 F.3d at 620). "[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3 at 620.

It cannot be inferred from Plaintiff's allegations that Corrections Officer James had knowledge that the other inmate was going to cut Plaintiff or that he reasonably could have taken measures to keep the inmate from cutting Plaintiff. Moreover, as previously discussed, Plaintiff has not adequately alleged that the cut posed a substantial risk of serious harm. Therefore, the Court dismisses this claim.

However, Plaintiff has stated a sufficient claim against Dr. Galite at this stage of the proceedings. If Plaintiff's allegations are true, then Dr. Galite had knowledge that Plaintiff was not receiving his HIV medication, and it can be inferred that he could have reasonably taken action to make sure that Plaintiff was getting his medication. Therefore, the failure to protect claim as to Dr. Galite may proceed to service.

### E.    Conditions of Confinement Claim

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). The assessment of whether the measures taken are reasonable turns on an analysis of two factors. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. Second, the officials must be shown to have demonstrated a deliberate indifference to the inmate's safety. *Id.* Deliberate indifference must be measured subjectively, that is:

> [A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to [the] inmate['s] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

Plaintiff's first conditions of confinement claim alleges that an Elmira corrections officer sprayed another inmate with mace, which made it hard for Plaintiff to breathe for an hour and a half. (Dkt. 1 at 3). The officer refused to open a window or get a nurse to bring Plaintiff his asthma pump. (*Id.*). The Second Circuit has held that poor air quality in a facility for a prolonged period can be an unconstitutional condition of confinement. *See Benjamin v. Fraser*, 343 F.3d 35, 52 (2d Cir. 2003) (holding "the presence of large numbers of inoperable windows, clogged or dirty ventilation registers and exhaust vents in showers and cells, and poor air quality" was a violation of the plaintiffs' constitutional rights), *overruled on other grounds*, *Caiozzo v. Koreman*, 581 F.3d 63, 71 (2d Cir. 2009). However, "[w]here the exposure is for a short period of time, courts have found no Eighth Amendment violation." *Clay v. Lee*, No. 13-CV-7662 (KMK), 2019 WL 1284290, at *6 (S.D.N.Y. Mar. 20, 2019) (collecting cases); *see Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) (noting that cases that successfully stated a conditions of confinement claim alleged that the prisoners "were directly exposed for lengthy periods" to the condition). Any exposure Plaintiff allegedly had to poor-quality air lasted for only an hour-and-a-half. Accordingly, the Court dismisses this claim.

Plaintiff also alleges that he was unable to wash himself or have a "hot meal" for a little less than a week because Auburn was on lockdown. (Dkt. 1 at 3). Denial of the ability to shower for a week does not rise to the level of a constitutional violation. *See, e.g.*, *Phelan v. Durniak*, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *11 (N.D.N.Y. Sept. 24, 2014) (holding that denying an inmate shower privileges for a week in May and a week in June is "not objectively sufficiently serious for purposes of an Eighth

Amendment conditions of confinement claim"). Additionally, the Constitution does not require that inmates be provided hot meals, but only that inmates be given "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quotation omitted). The Court accordingly dismisses these claims.

Plaintiff further alleges that he was denied adult diapers by Nurse Kasal despite his difficulty controlling his bowels at times while he sleeps, and that he has not received a new mattress to replace his soiled one. (Dkt. 13 at 4); *see generally Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (exposure to human waste can state an Eighth Amendment violation). Courts in this Circuit have recognized "that the condition of a prisoner's mattress may be so inadequate as to constitute an unconstitutional deprivation." *Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013) (discussing *Bell v. Luna*, 856 F. Supp. 2d 388, 397-98 (D. Conn. 2012), where the court denied a motion to dismiss because the inmate lived with a torn, unstuffed, and mildewed mattress for seven months). Moreover, "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation." *Id.*; *see Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("[T]his court and other circuits have recognized that deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement. . . ."). Accordingly, the Court will allow this claim to proceed to service.

Plaintiff further alleges that "I was placed in a cell with feces on the walls, sink, floor and no cleaning supplies" (Dkt. 12 at 7), that Plaintiff found hairs in his food, and

that he was bitten by flies. (Dkt. 13 at 4). "[W]e have long recognized that unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment." *Walker*, 717 F.3d at 127; *see, e.g., Gaston,* 249 F.3d at 165-66 (finding an Eighth Amendment claim where the plaintiff alleged the area in front of his cell "was filled with human feces, urine, and sewage water" for several consecutive days); *Wright v. McMann*, 387 F.2d 519, 522, 526 (2d Cir. 1967) (holding the placement of prisoner for thirty-three days in cell that was "fetid and reeking from the stench of the bodily wastes of previous occupants which . . . covered the floor, the sink, and the toilet," combined with other conditions, would violate the Eighth Amendment). While Plaintiff makes no allegations regarding the duration of his exposure, that is not necessary at this stage of the litigation. *See Walker*, 717 F.3d at 128 (holding the district court improperly dismissed the plaintiff's Eighth Amendment claim for failing to indicate "the exact extent or duration of [his] exposure to unsanitary conditions" (alteration in original)). Therefore, this claim may also proceed to service against Attica Corrections Officers John and Jane Does.

F.     **Claims of Retaliation**

"Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkeiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). A plaintiff asserting First

Amendment retaliation claims must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492).

"Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis*, 320 F.3d at 353). "In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill.' The issue is whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.'" *Lashley v. Wakefield*, 483 F. Supp. 2d 297, 300 (W.D.N.Y. 2007) (quoting *Gill*, 389 F.3d at 381).

In evaluating whether a plaintiff has established the necessary causal connection of a retaliation claim, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Shariff v. Poole*, 689 F. Supp. 2d 470, 479 (W.D.N.Y. 2010). "The Second Circuit has held that temporal proximity between an inmate's grievance and disciplinary action may serve as circumstantial evidence of retaliation[.]" *Candelaria v. Higley*, No. 04-CV-0277(MAT), 2013 WL 104910, at *9 (W.D.N.Y. Jan. 8, 2013) (citing *Colon*, 58 F.3d at 872-73). Accordingly, "[a] plaintiff can establish a causal connection that suggests

retaliation by showing that protected activity was close in time to the adverse action."

*Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Plaintiff alleges that Dr. Williams "did not hook me up to a heart monitor or order anything for my heart but Tylenol and discharge me out of retaliation." (Dkt. 18). Plaintiff has failed to allege that Dr. Williams took these actions because Plaintiff engaged in a form of protected speech. Therefore, this claim is dismissed.

On the other hand, Plaintiff has adequately alleged retaliation claims against Nurse Sault. Plaintiff alleges that because he filed the instant action and submitted grievances against Sergeant Michael, Dr. Williams, Nurse Lacowski, and W.C.C.H., Nurse Sault has filed three misbehavior reports against him. (Dkt. 8 at 1). He also alleges that Nurse Sault wrote him up in a false disciplinary report after he told her that he was going to file a grievance against her. (Dkt. 12 at 4). Filing a grievance or lawsuit is protected activity under the First Amendment. *Gill*, 389 F.3d at 384. Additionally, filing false misbehavior and disciplinary reports is an adverse action. *Id.* Moreover, drawing all rational inferences in Plaintiff's favor, he has sufficiently alleged a causal connection at this stage of the proceedings—he has alleged that Nurse Sault submitted her reports after she learned of Plaintiff's filings or intent to file, and that Nurse Sault told him she was writing him up because he threatened to write her up. (Dkt. 8 at 1; Dkt. 12 at 4).

Accordingly, Plaintiff's retaliation claims against Nurse Sault may proceed to service.

## G.    Procedural Due Process

Section 1983 requires a plaintiff to "show that the conduct in question deprived him of a right, privilege, or immunity secured by the Constitution or the laws of the United States, and that the acts were attributable at least in part to a person acting under color of state law." *Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 609 (E.D.N.Y. 2011) (citing *Washington v. Cty. of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004)).  The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Although prisoners retain some rights under the due process clause, "those rights are somewhat muted by institutional concerns inherent in a correctional system." *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992).  In raising a due process claim, a plaintiff must first establish that the challenged action infringed a constitutionally protected property or liberty interest.  Second, a plaintiff must show that he was deprived of the protected liberty interest without due process. *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

Plaintiff has failed to adequately allege a procedural due process claim.  Plaintiff alleges Ms. Fuller did not allow him to pursue administrative remedies for his grievances. (Dkt. 12 at 4).  "It is well established . . . that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (collecting cases).  Therefore, Plaintiff's procedural due process claim is dismissed.

### H. Equal Protection Claims

A state and its instrumentalities may not deny "any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. At its core, equal protection prohibits the government from treating similarly situated persons differently. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Sound Aircraft Services, Inc. v. Town of East Hampton*, 192 F.3d 329, 335 (2d Cir. 1999). Generalized allegations are insufficient to make out an equal protection claim. *See Crawford-El v. Britton*, 523 U.S. 574, 592 (1998) ("When intent is an element of a constitutional violation . . . the primary focus is not on any possible animus directed at the plaintiff; rather, it is more specific, such as an intent to disadvantage all members of a class that includes the plaintiff").

To claim Defendants' conduct violates his equal protection rights, Plaintiff must allege that:

> (1) [C]ompared with others similarly situated, [plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*Wayte v. United States*, 470 U.S. 598, 608-09 (1985); *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992).

Plaintiff alleges that Corrections Officer Leanton "was racist in the E.R." because he called Plaintiff a dumb monkey. "Prison officials' use of racial epithets or discriminatory comments reflecting racial prejudice do not, without more, violate the Constitution." *McEachin v. Bek*, No. 06-CV-6453(MAT), 2012 WL 1113584, at *13

(W.D.N.Y. Apr. 2, 2012); *see Baskerville v. Goord*, No. 97-CV-6413, 2000 WL 897153, at *3 (S.D.N.Y. July 6, 2000) ("[T]he use of racial slurs or epithets reflecting racial prejudice, although reprehensible, does not form the basis of a claim pursuant to § 1983."); *Wright v. Santoro*, 714 F. Supp. 665, 667 (S.D.N.Y. 1989) (holding comments made by prison official, including "Get your black ass out of my office" and "I'll lock your black ass up," unaccompanied by physical injury, did not amount to a violation of the plaintiff's Constitutional rights); *Keyes v. City of Albany*, 594 F. Supp. 1147, 1155 (N.D.N.Y. 1984) ("[T]he use of vile and abusive language, no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim."). Plaintiff cannot establish an equal protection violation with these allegations.

To be clear, if the allegations Plaintiff makes against Leanton are true, they are reprehensible. However, not all deplorable behavior rises to the level of a constitutional violation, and in this case, Plaintiff has failed to allege sufficient facts to state a claim. Plaintiff's equal protection claim must therefore be dismissed.

**I.      Denial of Access to Courts**

"[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). An inmate must allege "that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). "[T]he underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint,

- 34 -

just as much as allegations must describe the official acts frustrating the litigation," and "the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Christopher v. Harbury*, 536 U.S. 403, 415, 416 (2002). "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417-18 (footnote omitted).

Plaintiff's allegations are not sufficient to state a claim for denial of access to the courts. Plaintiff alleges he was denied use of the law library to write a supplemental brief (Dkt. 13 at 2), and that he is being denied a notary, legal supplies, and a typewriter (Dkt. 18 at 2). However, he fails to allege which cause of action he needs the materials for, or what impact his lack of access had on the lawsuit or lawsuits, if any. This claim is accordingly dismissed.

**J.    Supervisory Defendants**

Plaintiff makes limited allegations against Dr. Stone and Noeth, largely relying on their positions as supervisors to establish liability. (Dkt. 12 at 4). To establish liability against an official under § 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Moreover, the theory of *respondeat superior* is not available in a § 1983 action. *See Hernandez v. Keane*, 341

F.3d 137, 144 (2d Cir. 2003).  But a supervisory official can be found to be personally involved in an alleged constitutional violation in one of several ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Plaintiff alleges only that Superintendent Noeth did not allow any administrative remedy for his grievances.  (Dkt. 12 at 4).  If such a claim could go forward, "virtually every prison inmate who sues for constitutional torts by prison [employees] could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Thompson v. New York,* No. 99 Civ. 9875(GBD), 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001) (citation omitted).  Additionally, it is well established that vague and conclusory claims of constitutional violations without any underlying factual allegations fail to state a claim upon which relief can be granted under Section 1983.  *See, e.g., Webster v. Fischer*, 694 F. Supp. 2d 163, 179 (N.D.N.Y. 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability." (citing *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009))), *aff'd*, 398 F. App'x 683 (2d Cir. 2010).

Plaintiff's allegations that Stone failed to respond to his letters are also insufficient to state a claim. (*See* Dkt. 20 at 1). "[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (quotation omitted) (collecting cases). Plaintiff's claims against Noeth and Stone are therefore dismissed.

### III.    Americans with Disabilities Act Claims

Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To prove a violation of Title II, a party must therefore establish: (1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003). "The second prong requires the disabled plaintiff to allege that his or her mistreatment 'was motivated by either discriminatory animus or ill will due to disability.'" *Elbert v. N.Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) (quoting *N.Y. Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 112 (2d Cir. 2001)). "A disability discrimination claim may be brought either on the theory that defendant failed to make reasonable accommodations or on a more conventional disparate

treatment theory, or both." *Henrietta D. v. Bloomberg*, 331 F.3d 231, 275-77 (2d Cir. 2003) (quotation omitted).

Plaintiff alleges that Lynda Battaglia and mental health unit workers Hae and Forster used his diagnosis of anti-social personality disorder to keep him in the special housing unit ("SHU"). (Dkt. 13 at 4). It is unclear whether Plaintiff alleges a failure to make reasonable accommodations claim or a disparate treatment claim, but his allegations are not sufficient for either. Plaintiff fails to allege that he was denied any services, programs, or activities at Attica because of his placement in the SHU. *See Lee v. State, Dep't of Corr. Servs.*, No. 97 Civ. 7112(DAB), 1999 WL 673339, at *14 (S.D.N.Y. Aug. 30, 1999) (collecting cases). Additionally, Plaintiff does not allege that he was treated any differently from inmates who acted similarly to him but were not diagnosed with anti-personality disorder. *See Torrez v. Semple*, No. 3:17-cv-1232 (SRU), 2018 WL 2303018, at *8 (D. Conn. May 21, 2018) ("[The plaintiff] does not allege that the defendants treated or sanctioned him in a different way than they treated or sanctioned any other inmate who was involved in a physical altercation."); *Atkins v. County of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) ("Plaintiffs do not allege that the mentally disabled are the only prisoners subjected to [keeplock isolation] while the non-mentally disabled prisoners are excluded therefrom.").

Plaintiff's conclusory allegations are not sufficient to state an ADA claim, and accordingly are dismissed. *See Morgan v. Dzurenda*, No. 3:14-cv-966(SRU), 2014 WL 6673839, at *5 (D. Conn. Nov. 21, 2014) (dismissing ADA claim because "[t]he plaintiff's

general allegations that the defendants have discriminated against him because of his mental illness or diabetes condition are conclusory and unsupported by any facts.").

## IV.    John Doe Defendants

Plaintiff has named several John and Jane Doe defendants in his allegations. Pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam), the Court requests that the Attorney General of the State of New York ascertain, if possible at this time, the full names of these Defendants. The Attorney General is also requested to provide the addresses where these Defendants can currently be served. The Attorney General need not undertake to defend or indemnify these individuals at this juncture. This Order merely provides a means by which Plaintiff may name and properly serve the defendants as instructed by the Second Circuit in *Valentin*.

The Attorney General of the State of New York is hereby requested to produce the information specified above regarding the identities of these Defendants within **35 days**. Once this information is provided to the Court, Plaintiff's complaint shall be deemed amended to reflect the full names of the John and Jane Does, summonses shall be issued and the Court directs service on those Defendants.

The Clerk of Court shall send a copy of this Order, the Complaint (Dkt. 1), and the supplemental pleadings (Dkt. 8; Dkt. 10; Dkt. 12; Dkt. 13; Dkt. 14; Dkt. 15; Dkt. 16; Dkt. 18; Dkt. 20; Dkt. 22; Dkt 23), to Ted O'Brien, Assistant Attorney General in Charge, 144 Exchange Street, Rochester, New York 14614.

## V.  Motion for Temporary Restraining Order and Preliminary Injunction

Plaintiff has requested and moved for a Temporary Restraining Order and a Preliminary Injunction directing that he be provided with testing, Hepatitis C treatment, hypertension medication, a sleep apnea machine, a walking cane, a tens unit, a liver biopsy, various doctors, and monetary compensation, and further that he be moved to a regional medical unit of the Court's choosing.  (Dkt. 1 at 4; Dkt. 8 at 2; Dkt. 15; Dkt. 17).  The Court denies Plaintiff's motion and requests for the following reasons.

Federal Rule of Civil Procedure 65 provides that:

**(b) Temporary Restraining Order**

**(1) Issuing Without Notice**: The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

**(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

**(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

A motion for a preliminary injunction can only be issued on notice to the adverse party.  Fed. R. Civ. P. 65(a)(1).  While a hearing is generally required on a properly supported motion for preliminary injunction, oral argument and testimony are not required in all cases.  *See Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations,* 107 F.3d 979, 984 (2d Cir. 1997).  "A preliminary injunction is considered an 'extraordinary remedy that should not be granted as a routine matter.'"  *Distribution Systems of America, Inc. v. Village*

*of Old Westbury*, 785 F. Supp. 347, 352 (E.D.N.Y. 1992) (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).

The standards for a preliminary injunction and a temporary restraining order are the same. *City Carting, Inc. v. N.Y.C. Bus. Integrity Comm'n*, No. 14 Civ. 8582(PAC), 2014 WL 6604053, at *2 (S.D.N.Y. Nov. 13, 2014). To obtain a temporary restraining order or preliminary injunction, a plaintiff "must either (1) demonstrate a likelihood of success on the merits and irreparable injury, or (2) raise serious questions going to the merits, with the balance of hardship tipping in the plaintiff's favor." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011) (quotation omitted); *see also Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991). A violation of a constitutional right is considered "irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ("The district court . . . properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights.").

Plaintiff's request to be moved to a regional medical unit cannot be granted at this time. It is well-established that an inmate has no right to be confined in a particular prison within a given state. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983), *abrogated on other grounds, Sandin v. Conner*, 515 U.S. 472 (1995). The Second Circuit has explained:

> [There is] Supreme Court precedent holding that prisoners cannot dictate the particular institution within a penal system to which they are confined. In *Olim v. Wakinekona*, 461 U.S. 238 (1983), the Court ruled that "an inmate has no justifiable expectation that [s]he will be incarcerated in any particular prison within a State." *Id.* at 245. Rather, "[c]onfinement in *any* of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (emphasis added); *accord McKune v. Lile*, 536 U.S. 24, 39

- 41 -

(2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

*Lewis v. Rawson,* 564 F.3d 569, 578 n.8 (2d Cir. 2009); *see also Hooks v. Howard,* No. 9:07-CV-0724 (TJM)(RFT), 2008 WL 2705371, at *1 (N.D.N.Y. July 3, 2008) ("Insofar as plaintiff seeks a transfer to a different correctional facility, [her] motion must be denied. It is settled in this Circuit that an inmate does not a have a right to be confined to the prison of [her] own choosing."). Plaintiff has failed to allege circumstances or authority contrary to this well-established law, and accordingly has failed to establish a likelihood of success on the merits as to his transfer.

Plaintiff is also not entitled to injunctive relief at this stage for his medical requests. The Court has dismissed a substantial portion of Plaintiff's claims because it can only infer "mere disagreement over [his] proper treatment" from his allegations, not deliberate indifference. *Chance,* 143 F.3d at 703. For the claims that remain, in contrast to what is required to survive the Court's screening, Plaintiff must do more than merely set forth "enough facts to state a claim to relief that is plausible on its face" to establish a clear or substantial likelihood of success on the merits. *Twombly,* 550 U.S. at 570; *see Oneida Grp. Inc. v. Steelite Int'l U.S.A. Inc.,* No. 17-CV-0957 (ADS)(AKT), 2017 WL 6459464, at *8 (E.D.N.Y. Dec. 15, 2017) (noting that the standard required to prevail on a motion for a preliminary injunction "is higher than one to overcome a motion to dismiss"). At this point in the proceedings, the only facts the Court can base its decision on are allegations and grievances written by Plaintiff, which are not enough to establish a likelihood of success on the merits. *See, e.g., Chandler v. Graham,* No. 916CV0348DNHATB, 2016 WL

4411407, at *2 (N.D.N.Y. Aug. 19, 2016) (denying request for preliminary injunction where plaintiff "failed to substantiate any allegations of irreparable harm with evidence in admissible form or to demonstrate, with evidence, a likelihood of success on the merits of his underlying claims or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor"); *Scarbrough v. Evans*, No. 909-CV-0850 NAM DEP, 2010 WL 1608950, at *3 (N.D.N.Y. Apr. 20, 2010) (denying motion for preliminary injunction where plaintiff's sole proof was his own affidavits, because "[p]laintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief"); *Purdie v. Supervisor, Admin. Mail Room, Auburn Corr. Facility*, No. 9:09CV951FJS/ATB, 2010 WL 148639, at *4 (N.D.N.Y. Jan. 13, 2010) ("Plaintiff has failed to submit proof or evidence that meets [the preliminary injunction] standard. Plaintiff has submitted only his own affidavit containing his request for injunctive relief and the reasons why he believes the Court should grant his request. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief."). Accordingly, Plaintiff's motion and requests for a TRO and preliminary injunction (Dkt. 1 at 4; Dkt. 8 at 2; Dkt. 15; Dkt. 17) are denied.

## VI.     Counsel Request

In deciding whether to appoint counsel, the Court must first determine whether an indigent's position seems likely to be of substance, and if the claim meets this threshold requirement, the Court should then consider a number of other factors in making its determination. *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986). This action was only recently commenced. Therefore, Defendants have not yet responded to the

allegations, and the only facts upon which this Court may base its decision as to whether this lawsuit is of substance are Plaintiff's own allegations surrounding his claims. At this stage, the Court lacks sufficient information to consider the factors set forth in *Hodge*. Plaintiff's request for appointment of counsel is thus denied without prejudice as premature.

## CONCLUSION

For the reasons set forth above, Plaintiff's application to proceed *in forma pauperis* (Dkt. 7) is granted, and Plaintiff's motions to amend (Dkt. 8; Dkt. 10; Dkt. 13; Dkt. 15; Dkt. 18; Dkt. 20; Dkt. 22; Dkt. 23) are granted. Plaintiff's request for a hearing "for the medical damages and costs for treatment" (Dkt. 16) and motion to appoint counsel (Dkt. 21) are denied without prejudice as premature. Plaintiff's motion and requests for a temporary restraining order and a preliminary injunction (Dkt. 1 at 4; Dkt. 8 at 2; Dkt. 15; Dkt. 17) are denied.

Additionally, the Court finds pursuant to 28 U.S.C. § 1915(e)(2) that the following claims may proceed to service: (1) denial of medication in violation of Plaintiff's Eighth Amendment rights by Southport Nurse Jane Doe, Nurse Bonner, and Attica Doctors John and Jane Does; (2) denial of treatment for kidney failure in violation of Plaintiff's Eighth Amendment rights by Attica Doctors John and Jane Does; (3) denial of mental health treatment following attempted suicide in violation of Plaintiff's Eighth Amendment rights by Long and Forster; (4) violation of right to privacy by Nurse Sault and Nurse Yates; (5) excessive use of force by Roberts and Forster; (6) excessive use of force by Scyrous/Skoczylas; (7) failure to protect by Dr. Galite; (7) unlawful conditions of

confinement by Nurse Kasal; (8) unlawful conditions of confinement by Attica Corrections Officers John and Jane Does; and (9) retaliation by Nurse Sault.

The remainder of Plaintiff's claims are dismissed without prejudice. If Plaintiff wishes to reassert the other claims dismissed by this Order, he must move to amend his complaint and attach to his motion a proposed amended complaint that: (1) includes the allegations of the claims that the Court has allowed to proceed to service in this Decision and Order, and (2) repleads the claims that were dismissed so that they comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. The Court will then examine the proposed amended complaint and decide pursuant to Federal Rule of Civil Procedure 15 whether to give Plaintiff leave to file it. Plaintiff is advised that an amended complaint is intended to **completely replace** the prior complaint in the action. "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (*quoting Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, Plaintiff's amended complaint must include all of the allegations against each of the Defendants, so that the amended complaint may stand alone as the sole complaint in this action which the Defendants must answer.

Plaintiff is also advised that he should not continue to file motions on an almost weekly basis that contain mostly repetitive and/or meritless allegations. "The district courts have the power and the obligation to protect the public and the efficient administration of justice from individuals who have a history of litigation entailing vexation, harassment and needless expense to [other parties] and an unnecessary burden

on the courts and their supporting personnel." *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000) (alteration in original) (quotations omitted). "The issuance of a filing injunction is appropriate when a plaintiff abuse[s] the process of the Courts to harass and annoy others with meritless, frivolous, vexatious or repetitive . . . proceedings." *Id.* (alterations in original) (quotations omitted); *see also Malley v. New York City Bd. of Educ.*, 112 F.3d 69, 69 (2d Cir.1997) (per curiam) (holding that a filing injunction may issue if numerous complaints filed are based on the same events). In other words, if Plaintiff continues to submit repetitive, mostly meritless motions, the Court may issue an order that would prevent Plaintiff from submitting any future filings.

## ORDER

IT HEREBY IS ORDERED, that Plaintiff's application to proceed *in forma pauperis* (Dkt. 7) is granted;

FURTHER, that Plaintiff's request for assignment of counsel (Dkt. 21) and a hearing (Dkt. 16) are denied without prejudice as premature;

FURTHER, that Plaintiff's Motions for preliminary injunctive relief (Dkt. 17) is denied;

FURTHER, that Plaintiff's Motions to Amend (Dkt. 8; Dkt. 10; Dkt. 13; Dkt. 15; Dkt. 18; Dkt. 20; Dkt. 22; Dkt. 23) are granted;

FURTHER, that the Clerk of Court is directed to restore as Defendants Roberts, Scyrous/Skoczylas, and Forster, and to add as Defendants Southport Nurse Jane Doe, Dr. Galite, Nurse Bonner, Nurse Sault, Nurse Yates, Nurse Kasal, Corrections Officer Long,

Attica Doctors John and Jane Does 1-5, and Attica Corrections Officers John and Jane Does 1-5;

FURTHER, that the Clerk of the Court is directed to cause the United States Marshal to serve copies of the Summons, the Complaint (Dkt. 1) and the supplemental pleadings (Dkt. 8; Dkt. 10; Dkt. 12; Dkt. 13; Dkt. 14; Dkt. 15; Dkt. 16; Dkt. 18; Dkt. 20; Dkt. 22; Dkt 23; Dkt. 24) and this Order upon the remaining named Defendants and John and Jane Doe Defendants, once identified, without Plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Plaintiff's favor;

FURTHER, the Clerk of Court is directed to forward a copy of this Order by email to Ted O'Brien, Assistant Attorney General in Charge, Rochester Regional Office <Ted.O'Brien@ag.ny.gov>;

FURTHER, that, pursuant to 42 U.S.C. § 1997e(g), Defendants are directed to respond to the Amended Complaint upon service.

SO ORDERED.


_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: June 18, 2019
       Rochester, New York